Fritz v. Daly et al.          CV-06-191-PB  10/31/06

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Randal C. Fritz

    v.                                  Case No. 06-cv-191-PB
                                            Opinion No. 2006 DNH 125
Katharine A. Daly, Kenneth C. Brown,
Roxanne Juliano, Suzanne M. Gorman,
Karen A. Levchuk, Deborah R. Reynolds,
Marta E. Rodriquez, Laura D. Simoes,
Griffin T. Dalianis, Gayle Troy, et. al.



MEMORANDUM AND ORDER


Randal Fritz, an investigator working for the New Hampshire Commission for Human Rights, brings this suit pursuant to 42 U.S.C. § 1983, alleging that the Commission's Executive Director and numerous other state officials and employees violated his First Amendment rights by retaliating against him for making certain statements to his administrative superiors and a complainant's attorney. Defendants move to dismiss, arguing that Fritz's statements are not protected by the First Amendment because he made the statements pursuant to his official duties. Alternatively, defendants argue that they are entitled to

qualified immunity.  For the reasons set forth below, I grant defendants' motion.

## I.  BACKGROUND[1]

This case arises from a letter Fritz wrote in his capacity as a Commission investigator.  In addition to the Commission's Executive Director, Katharine Daly, Fritz has sued: Commissioners Kenneth C. Brown, Deborah R. Reynolds, Marta E. Rodriquez, Laura D. Simoes, Griffin T. Dalianis, and Gayle Troy; Commission Assistant Director Roxanne Juliano; Senior Assistant Attorney General Suzanne Gorman; Director of Personnel Karen A. Levchuk; and other unnamed defendants.

On October 4, 2005, while investigating a hostile work environment claim in the matter of Jibril Salaam v. University of New Hampshire, Fritz mailed a letter to Salaam's attorney,

---

[1]  Because this is a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), I take the facts as they are alleged in the plaintiff's complaint.  See Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 9 (1st Cir. 2004).  I also consider the 14 Exhibits attached to the complaint without converting the motion to dismiss to one for summary judgment.  See Stein v. Royal Bank of Canada, 239 F.3d. 389, 392 (1st Cir. 2001).

Heather Burns, entitled "Confidential and for Settlement Purposes Only." Exhibit 2. In the letter, Fritz outlined the legal standard for proving a hostile work environment claim, and bluntly assessed what he saw as the lack of merit in Salaam's claim. Specifically, Fritz wrote:

> I have reviewed the extensive submissions of information and am mystified to determine what exactly triggers [Salaam's claim]. . . . The facts are more appropriately categorized as [t]he maturation of diversity in style, differences of opinion on policy, procedure and "sense of mission", and Claimant's self-interest to push the envelope in demanding UNH unilaterally yield to his master's degree internship schedule, into conflict among many administrative/ bureaucratic actors. Add to these turf wars and other stock office politics as the backdrop of Admissions Office's multicultural subdivision <u>and</u> the employer's obvious disappointment, frustration, and even level of distrust after discovering the incongruity in Claimant's resume with his lack of undergraduate degree completion.
>
> . . .
>
> Under separate cover you will receive a request for information from the Commission which may assist my present inability to catch a glimpse of a 354-A/Title VII action. If the answers to the requests are more of the same, I might invite Claimant to . . . [pursue other avenues] or look into a non-litigation dispute resolution forum.

<u>Id.</u> (emphasis in original).

On October 5, 2005, Director Daly received a phone call from Attorney Burns expressing her concern with Fritz's letter. Complaint at ¶¶ 37-40. Burns claimed that Fritz had improperly weakened her bargaining position with her adversary by writing the letter without first interviewing Salaam or reviewing dispositive evidence she claimed was in the case file. Daly discussed the matter with Fritz, who defended himself, stating that the record in the case supported his opinions and actions.

On October 7, 2005, Fritz sent Daly a five-page written memorandum entitled "Silencing the Messenger," in which he accused Attorney Burns, her law firm, Upton & Hatfield, and "a small group of plaintiff attorneys" of attempting to "silence" him in his role as Commission investigator. Complaint at ¶ 41, Exhibit 3. He wrote: "they are using these complaints to you in your role as Director as a scheme to manipulate the Commission into pressuring me into *never, through any means of communication, indicating any factual or legal deficiency in their client's cases*." Exhibit 3 (emphasis in original). He characterized the matter as "an up-the-ladder-behind-my-back assault on me in my official capacity," warned of the dangers of

a compromised investigation system, and lamented the threat to his "professional reputation and relationship with the Commission and its Director." Id. Fritz also rebuked Daly for criticizing his job performance. Id. Specifically, he stated:

> [W]hen you state that "I made a mistake" you do so without basis and embed your own feelings, personality, and methodologies into an arena where they do not belong – my negotiation. This is my canvas. Artists should not pick up a brush and start painting on someone else's canvas or tell them the tree is in the wrong place.
>
> . . .
>
> Here is what I need you to do in this matter and in the future: review the process, if I have not stepped outside my legal authority or ethical strictures then you will call the complaining attorney back and simply tell them that after review you advise them to obtain a box of tissues and [] send over a violinist. . . . If you permit these types of complaints to undermine my authority, discretion, and denigrate me professionally, it is like dealing with spoiled children, it will only get worse.

Id. (emphasis in original). The letter goes on in this manner for five pages, and concludes with Fritz's concern that the "silencing" will spread to other investigators and the Commission's efforts will be irreparably harmed. Id.

On October 10, 2005, Fritz sent Daly an e-mail in which he requested further discussion of the Salaam case and suggested

-5-

Daly inform Burns' opposing attorney of the *ex parte* phone conversation between Daly and Burns. Complaint at ¶ 42, Exhibit 4. On October 11 and 14, 2005, Fritz again spoke to Daly about the Salaam case, discussing the October 4th letter, the Commission's custom and practice of writing such settlement letters, the *ex parte* communication between Daly and Burns, and a prior investigator's notes on the case. Complaint at ¶¶ 11-50.

On November 3, 2005, Daly sent Fritz a note asking him to write a letter to Salaam's attorneys indicating that he had written the October 4th letter without having interviewed the claimant or his purported witnesses. Complaint at ¶¶ 51-56, Exhibit 5. Daly offered to write the letter if Fritz would not. Exhibit 5. On November 4, 2005, Fritz e-mailed Daly to inform her that he would not write the letter. Complaint at ¶ 60, Exhibit 6.

On November 7, 2005, Daly sent a letter to Burns. She apologized for Fritz's summary treatment of Salaam's claim, and affirmed Burns' belief that a Commission investigator should remain neutral, avoid sarcasm and extreme opinions about one party's case, and request information from a claimant as part of

his investigation.  Complaint at ¶¶ 62-66, Exhibit 7.  She said:

> The role of the investigator according to our
> rules (Hum 203.03) is to discover facts and
> make reports and recommendations to the
> investigating commissioners, and to *assist*
> the parties in settlement negotiations.  Hum
> 203.03(a) requires that the investigator
> *shall maintain a neutral position* with regard
> to the parties at all times.

Exhibit 7 (emphasis in Daly's letter).  Daly said that Fritz's

October 4th opinion letter was out of step with the Commission's

established investigative process, and that she had counseled him

how to avoid similar situations in the future.  Id.

On November 18, 2005, Fritz sent Daly a letter notifying her

that he was recusing himself from Commission matters involving

the law firm of Upton & Hatfield because of conflicts in the

Salaam case and another Upton & Hatfield case.  Complaint at ¶

70, Exhibit 8.  He also said that the communications and actions

taken against him in the office "activate various legal concerns

that will have to be addressed . . . ."  Id.

Daly responded on November 21, 2005, writing, "I have no

idea what [Fritz's intent to "activate" various legal concerns]

means.  **But I strongly caution you against taking any action on**

**your own at this point.**"  Complaint at ¶ 71, Exhibit 9 (emphasis

in original). She also tried to set-up a meeting to talk. Fritz responded the same day asking what Daly meant in "cautioning" him, inquiring as to the purpose of a meeting, and questioning her attitude and behavior during her public interruption of his speech at an unrelated conference. Exhibit 10. He wrote again on November 23, 2005 to the same effect. Exhibit 11.

On November 30, 2005, Daly sent Fritz an e-mail entitled "Pre-disciplinary Meeting Notice," which stated that "the evidence for the discipline is present in your letter of October 4, 2005 to Attorney Heather Burns and all your subsequent communications to me and your actions since then . . . ." Complaint at ¶ 34, Exhibit 1.

During the pre-disciplinary meeting on December 6, 2006, Fritz read an eight-page statement, in which he alleged, among other things, that Daly was retaliating against him because he had opposed Daly's favoritism toward her former employer, Upton & Hatfield. Exhibit 12. Fritz recounted the facts largely as described above, focusing more on Daly's actions and less on his own statements to her. Id. In particular, he listed more than a dozen reasons why Daly's November 7th letter was intentionally

misleading, constituted "vicious derogatory" retaliation against him, and "clearly reveals that the Director serves as the Guardian Angel over her former employer's cases."[2] Id. He concluded by recommending that the Commission take steps to "clean up this mess," including commencing an internal investigation into violations of the Commission's ethics policies.

On December 15, 2005, Daly and Commissioner Brown notified Fritz in writing that he was suspended for three days without pay and that all his correspondence for six weeks would be subject to review and mandatory prior approval. Complaint at ¶ 87. On February 27, 2006, Brown notified Fritz that because he had failed to submit any correspondence for review since December 15 (with the exception of one report), the mandatory correspondence review and approval period would be extended an additional six weeks. Exhibit 14.

Fritz initiated this lawsuit on March 26, 2006, alleging that Commission officials had deprived him of his First Amendment rights by retaliating against him for engaging in protected

---

[2] Daly had previously worked for the firm of Upton & Hatfield.

speech.  He complains that the following actions constitute such retaliation: (1) Daly's November 7th letter to Burns; (2) Daly's November 21st e-mail cautioning him to cease action; (3) the November 30th pre-disciplinary notice; (4) the December 6th pre-disciplinary hearing; (5) the December 15th suspension and supervision; and (6) the February 27th extension of supervision.

## II.  **STANDARD OF REVIEW**

"A district court may grant a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." Nathan P. v. W. Springfield Pub. Sch., 362 F.3d 143, 145 (1st Cir. 2004) (citation omitted).  My "task is not to decide whether the plaintiff ultimately will prevail but, rather, whether he is entitled to undertake discovery in furtherance of the pleaded claim." Rodi, 389 F.3d at 13.  In considering a motion to dismiss, I "accept as true the well-pleaded factual allegations of the complaint, draw all reasonable inferences therefrom in the plaintiff's favor and determine whether the complaint, so read,

sets forth facts sufficient to justify recovery on any cognizable theory." <u>Martin v. Applied Cellular Tech.</u>, 284 F.3d 1, 6 (1st Cir. 2002).


## III. <u>ANALYSIS</u>

Fritz contends that the defendants violated his First Amendment rights by retaliating against him after he wrote the October 4th letter and resisted what he contends was improper interference by Daly with the performance of his duties. Defendants argue that Fritz's speech is not protected by the First Amendment because he made the statements on which his claim is based pursuant to his official duties. Alternatively, defendants argue that they are entitled to qualified immunity.

In cases where a plaintiff's First Amendment rights collide with the companion legal doctrine of qualified immunity, I begin with the question of whether the facts as alleged make out a violation of the First Amendment. <u>See</u> <u>Dirrane v. Brookline Police Dep't</u>, 315 F.3d 65, 70 (1st Cir. 2002) (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). If I determine that no such violation occurred, I need not continue the qualified immunity

analysis because plaintiff's claim fails as a matter of law and will be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). <u>See id.</u> at 69-70. If, however, plaintiff's complaint makes out a constitutional violation, I must determine whether the constitutional right at issue was clearly established at the time of the putative violation. <u>Saucier</u>, 533 U.S. at 202; <u>Pagan v. Calderon</u>, 448 F.3d 16, 31 (1st Cir. 2006).

## A. **Are Fritz's Statements Protected Speech?**

To prevail on a First Amendment claim, a public employee must show that he engaged in protected speech. <u>See Garcetti v. Ceballos</u>, 126 S.Ct. 1951, 1957-60 (2006). If the plaintiff satisfies this first element of his retaliation claim, he must additionally show that (1) the First Amendment interests of the plaintiff and the public outweigh the government's interest in functioning efficiently; and (2) that his protected speech was a substantial or motivating factor in the adverse action against him. <u>Jordan v. Carter</u>, 428 F.3d 67, 72 (1st Cir. 2005). A public employee engages in protected speech when he speaks "as a citizen on a matter of public concern." <u>Garcetti</u>, 126 S.Ct. at 1958 (2006). "[W]hen public employees make statements pursuant

to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 1960.

The inquiry to determine whether an employee is acting pursuant to his official duties "is a practical one." Id. at 1961. Rather than parsing an employee's job description, I must examine the "content, form, and context" of the speech to determine whether the employee was acting primarily as a concerned citizen or as an employee. See Bailey v. Dep't of Elementary & Secondary Educ., 451 F.3d 514, 518 (8th Cir. 2006); Jordan, 428 F.3d at 72.

It is beyond dispute that Fritz's October 4th letter does not qualify as protected speech because he was acting pursuant to his official duties rather than as a private citizen when he wrote the letter. As for his remaining communications, the context in which they occurred dooms his case. Here, the statements at issue all relate to Fritz's effort to defend his job performance against what he perceived was unjust criticism by his employer. After Daly told him that he had made a mistake in

writing the October 4th letter, he engaged in a series of communications with her in which he defended his actions and charged her with improper interference. He continued these efforts at a disciplinary hearing, where he told his administrative superiors why he should not be disciplined and claimed that it was Daly who was acting improperly. Such communications are quintessentially a part of an employee's official duties.

If Fritz's contrary conception of the law were true, a public employee acting illegally or unethically could avoid the specter of discipline by simply responding to his employer's job-related inquiries with denials and counter accusations of corruption. The employee would then be free to claim, as Fritz does here, that any effort to hold him to account for his misconduct is a violation of his First Amendment rights. Such a result is simply untenable. Public "employees retain the prospect of constitutional protection for their contributions to the civic discourse. This prospect, however, does not invest them with a right to perform their jobs however they see fit." Garcetti, 126 S. Ct. at 1960.

-14-

Because Fritz made his statements pursuant to his official duties, they do not qualify as protected speech. Thus, Fritz fails to state a viable First Amendment claim.

**B.      Are Defendants Entitled to Qualified Immunity?**

Though I conclude that no First Amendment violation occurred, I need not rest my dismissal on that determination. Assuming *arguendo* that Fritz makes out a colorable claim that his statements qualify as protected speech, defendants nevertheless are entitled to qualified immunity because the particular right for which Fritz claims protection was not clearly established at the time of the challenged conduct. See Dirrane, 315 F.3d at 69. A public employee's right to claim First Amendment protection for protected speech turns on the so-called "Pickering balancing test," which weighs the First Amendment interests of the plaintiff and the public against the government's interest in functioning efficiently. See Jordan, 428 F.3d at 73-74 (applying Pickering v. Bd. of Educ., 391 U.S. 563 (1968)). "Because Pickering's constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered clearly established for purposes of qualified immunity." Fabiano v. Hopkins, 352

-15-

F.3d 447, 457 (1st Cir. 2003) (internal quotations omitted).

Here, the Executive Director and presiding commissioners of a public agency disciplined Fritz for the violation of Commission regulations.  Fritz plainly violated these regulations when he wrote the October 4th letter.[3]  Thus, Daly was entitled to take corrective action against him both for writing the letter and for refusing her reasonable requests for corrective action.  While Fritz's counter charges that Daly had engaged in improper *ex parte* communications and favored litigants represented by her former law firm appear to address matters of public concern that might have qualified as protected speech prior to Garcetti,[4] Fritz's charges "were nestled in a morass" of plainly unprotected statements aimed at avoiding discipline for his improper job performance.  See Dirrane, 315 F.3d at 71.  Under these

---

[3] Fritz alleges that the Commission, in practice, acquiesced in similar practices by other investigators.  Complaint at ¶47.  Even if this were true, however, it does not change the fact that Fritz's conduct violated the plain language of Hum 203.03.

[4] Prior to Garcetti, neither the Supreme Court nor the First Circuit had clearly held that an employee lacks First Amendment protection for statements that he makes pursuant to his official duties.

circumstances, and given the relatively modest discipline that was imposed, it simply cannot be said that a similarly situated employer would have understood that her actions were unlawful under the Pickering balancing test.  See Saucier, 533 U.S. at 202.

Although I rule against Fritz today, I do not suggest that a public employee who has knowledge of government misconduct must remain silent.  There exists a "powerful network of legislative enactments – such as whistle-blower protection laws and labor codes – available to those who seek to expose wrongdoing." Garcetti, 126 S.Ct. at 1962.  See 5 U.S.C. § 2302(b)(8) (2004); N.H. Rev. Stat. Ann. § 275-E:2 (1988).  In addition, the First Amendment continues to protect public employees who speak out on matters of public concern as citizens rather than pursuant to their official duties.  In this order, I merely hold that defendants are entitled to qualified immunity from Fritz's damage claim because his statements do not qualify as protected speech and, alternatively, because a reasonable employer would not have understood that the discipline that was imposed was unlawful.

## IV.  CONCLUSION

For the reasons stated above, I grant defendants' motion to dismiss (Doc. No. 23).

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

October 31 , 2006

cc:  Paula J. Werme, Esq.
     Pierre Rumpf, Esq.
     Nancy J. Smith,Esq.
     Debra Weiss Ford, Esq.
     Russell F. Hilliard, Esq.